Filed 6/4/25  P. v. Liccardo CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>ARI LICCARDO,<br><br>    Defendant and Appellant. | A169157<br><br>(San Francisco County<br>Super. Ct. No. 22003372) |

A jury found defendant Ari Liccardo guilty of possessing a firearm as a felon and other firearm-related offenses after police found a loaded firearm in his car during a probation search.  Defendant challenges his convictions based on the Second Amendment and *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*).  We affirm.

**BACKGROUND**

*The Prosecution's Case*

On April 3, 2022, a shooting occurred near the Alice Chalmers Playground in San Francisco.  Brandon Cheese (Brandon) and Kiernan Carlson (Kiernan) were killed, and two others were injured.  The police believed the shooting was gang related and some of the victims were members or affiliates of the Excelsior Mob criminal street gang.

On April 6, there was a memorial at the playground.  Uniformed police officers were "assigned to a fixed post" at the playground, meaning a patrol

1

unit would "stay at a particular location for a certain amount of time . . . typically to have a well-known police presence." Officers testified they did not witness any violence during their fixed post shifts at the playground that day.

Officers ran the license plates of vehicles parked near the playground and identified a burgundy Honda as registered to defendant. Because defendant was on probation with a search condition, officers searched his car, where they found a firearm in the glove compartment. The firearm was a functional nine-millimeter semiautomatic firearm with a magazine containing 10 cartridges.

The parties stipulated that defendant had a prior felony conviction and that on April 6, 2022, defendant was on probation and "[a]s part of the probation order, the Court ordered the defendant not to own, purchase, receive, or possesses a firearm."

*Defense*

Defendant and shooting victim Brandon had been friends since they were children; according to Brandon's mother, "[t]hey were like brothers." She testified that she was concerned about safety at the memorial and that some people did not attend because they thought it might be dangerous.

Defendant testified on his own behalf.[1] He met Brandon in sixth grade, and they "did everything together for a long time." When defendant was 15, he "was jumped by multiple men," beaten, and shot in the face. This "left [him] anxious, paranoid, nervous, scared."

---

[1] Defendant acknowledged that he had felony convictions from February 2019 and June 2020, that he had been on probation since the convictions, and that he was not allowed to have any guns as a condition of probation.

2

According to defendant, there were two memorials set up next to each other at the playground, one for Brandon and the other for shooting victim Kiernan. The first time defendant went to the memorial, he did not take a gun. Defendant was concerned about "the amount of people up in the street" and that he did not know who everyone was. He knew Excelsior Mob or 52 Mob was "[a] group of people from the Excelsior district," and he thought the group was "involved in the situation" because there were "52 balloons" at the memorial and because Kiernan "was an up-and-coming artist" who talked about being from Excelsior in his music. Defendant spoke to people who had survived the shooting and residents near the playground, some of whom showed him surveillance video taken at the time of the shooting. He heard that Kiernan "was the initial target," and he saw on social media "people basically laughing about Kiernan and Brandon's death" and "a lot of, you know, threats going both ways." He also learned the memorial had been damaged, with candles kicked over and pictures ripped down, and this "felt like whoever was responsible was saying that we know you're here."

Defendant was concerned about safety at the memorial; he testified, "The police weren't there, and I was afraid." He decided to get a gun and take it to the memorial because he was "scared for [his] safety and the safety of Brandon's family." Defendant testified April 6 "was basically like the big celebration day" and Brandon's mother told him Brandon's parents, daughter, and three sisters would be there that day. On the morning of April 6, he went to Oakland and bought a gun. Defendant then drove to the playground, arriving between 10 and 11 a.m. and remaining there all day. He talked to people, listened to music, and stood next to his car. He was there without incident until he was arrested around 8:00 p.m.

Defendant saw police at the memorial. He asked an officer "if it would be possible to block the street off so that the threat of violence would be mitigated, and he denied that."[2] The police presence did not make him feel the situation was safe for Brandon's family. Defendant was afraid "people would get shot again," and he "didn't think that the police were in a position to protect [him] or anybody else at the memorial." He reasoned, "[I]f a car was to stop right in front of where we were at and start shooting, there was nothing the police could stop. They might be able to chase the car or they might be able to do something, but the shooting will have already started." He thought having a gun "was a deterrent." He testified, "Most people get scared when they see a gun, so I felt like if I was to be attacked and a weapon was shown it would be a deterrent from anybody trying to come closer."

Asked on cross-examination whether he called 911 and asked the police to come to the playground, defendant responded, "Would they have showed up?" and "What was I supposed to tell them? What's the emergency? They're not going to show up for no reason."

*Jury Verdict and Sentence*

The jury found defendant guilty of possession of a firearm by a felon (Pen. Code,[3] § 29800, subd. (a)(1) (section 29800(a)(1)); count 1), carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(1); count 2), carrying a loaded firearm in public (§ 25850, subd. (a); count 3), and possessing a firearm while on probation with a condition prohibiting such possession (§ 29815, subd. (a); count 4). As to counts 2 and 3, the jury found defendant was previously convicted of a felony.

---

[2] Defendant also asked how long the police were going to be there and was told they would be there for 30 days.

[3] Undesignated statutory references are to the Penal Code.

4

Defendant was sentenced to 16 months in state prison; the trial court suspended execution of the sentence and placed him on two years of formal probation.

## DISCUSSION

Defendant raises various challenges to his convictions based on the Second Amendment. He contends (1) his conviction of felon in possession of a firearm (count 1) is facially unconstitutional under *Bruen*, *supra*, 597 U.S. 1; (2) his convictions of carrying a concealed firearm (count 2) and carrying a loaded firearm in public (count 3) must be reversed because California's firearm licensing scheme is facially unconstitutional under *Bruen*; (3) his conviction of count 1 is unconstitutional as applied to him; and (4) the trial court erred in denying his requested modification of a jury instruction, which modification he claims is required under the Second Amendment.

A.     *Facial Constitutional Challenge to Count 1, Felon in Possession*

       1.     <u>Legal Principles and Standard of Review</u>

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.)

In *District of Columbia v. Heller* (2008) 554 U.S. 570, 595 (*Heller*), the United States Supreme Court recognized, based on "both text and history, that the Second Amendment conferred an individual right to keep and bear arms." The Court went on to explain the right is not "unlimited" and has never been understood to be "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and the Court specifically identified as "presumptively lawful regulatory measures"

5

"longstanding prohibitions on the possession of firearms by felons."[4] (*Id*. at pp. 626–627 and fn. 26.)

Subsequently, in *Bruen*, the United States Supreme Court set forth the following framework for deciding Second Amendment claims: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen, supra,* 597 U.S. at p. 17.)

The Court explained that "history guide[s] our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " (*Bruen, supra*, 597 U.S. at pp. 28–29.) "[A]nalogical reasoning under the Second Amendment is neither a regulatory

---

[4] Other presumptively lawful regulations identified by the Supreme Court were "prohibitions on the possession of firearms by . . . the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms." (*Heller, supra,* 554 U.S. at pp. 626–627.)

straightjacket nor a regulatory blank check. . . . [It] requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Id*. at p. 30.)

More recently, in *United States v. Rahimi* (2024) 602 U.S. 680 (*Rahimi*) the United States Supreme Court cautioned that its Second Amendment "precedents were not meant to suggest a law trapped in amber." (*Id*. at pp. 691, 700 [holding a federal statute prohibiting a person subject to a domestic violence restraining order from possessing a firearm withstands a Second Amendment challenge and rejecting argument that the historical analogues were insufficiently similar "to place the [federal law] in our historical tradition"].) The Court explained, "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. [Citation.] A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " (*Id*. at p. 692.)

"A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).) A facial constitutional challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the [challenged law] would be valid.' [Citation.] That means that to prevail, the Government need only demonstrate that [the law] is constitutional in some of its applications." (*Rahimi*, *supra*, 602 U.S. at p. 693.)

We review constitutional challenges to statutes de novo. (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474 (*Alexander*).)

2.  Analysis

Section 29800(a)(1), provides in relevant part, "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."

Defendant contends section 29800(a)(1) facially violates the Second Amendment under *Bruen*. Since the United States Supreme Court decided *Bruen*, many criminal defendants have made this argument, and Courts of Appeal have all rejected it. (E.g., *People v. Gomez* (2025) 110 Cal.App.5th 419, 438–439 (*Gomez*) [citing cases and concluding section 29800(a)(1) does not violate the Second Amendment]; *People v. Richardson* (2025) 108 Cal.App.5th 1203, 1212; *People v. Bey* (2025) 108 Cal.App.5th 144, 162 (*Bey*); *People v. Anderson* (2024) 104 Cal.App.5th 577, 582 (*Anderson*); *Alexander*, *supra*, 91 Cal.App.5th at p. 479.)

Some courts have rejected challenges to section 29800(a)(1) on the ground the Second Amendment simply does not apply to felons. In *Alexander*, *supra*, 91 Cal.App.5th at page 478, the court reasoned that, "according to *Heller* and *Bruen*[,] only law-abiding citizens are included among 'the people' whose right to bear arms is protected by the Second Amendment." "Convicted felons, by definition, are not law abiding. Felons thus are not among 'the people' who have an individual right to possess firearms under the Second Amendment." (*Id.* at p. 479; and see *People v. Richardson*, *supra*, 108 Cal.App.5th at p. 1212 [agreeing with the reasoning of *Alexander* "and similar cases that under the United States Supreme Court's precedent, only 'law-abiding' citizens are among the class of people

8

covered by the text of the Second Amendment"].)  The Attorney General urges us to follow these cases, arguing that defendant, as a convicted felon, is not part of "the people" protected by the Second Amendment.

In *Anderson*, *supra*, 104 Cal.App.5th at page 588, Division Three of our court rejected the premise " 'that only "law-abiding, responsible citizens" are counted among "the people" protected by the Second Amendment.' " "[D]eclin[ing] to exclude any American from the national community that 'We the People' formed by adopting the United States Constitution," the court found "no basis for categorically excluding persons with prior felony convictions from the protections of the Bill of Rights."  (*Ibid*.)

Instead, the *Anderson* court applied *Bruen*'s analytical framework and determined that section 29800(a)(1) does not violate the Second Amendment. (*Anderson*, *supra*, 104 Cal.App.5th at pp. 589–600.)  Considering historical tradition, the court surveyed "sources from 17th Century England, colonial America, and the early federal period" and found they "demonstrate that California's felon-in-possession firearm regulations comport with our national tradition of firearm regulation."  (*Id*. at p. 589.)  After describing historical practices at length (see *id*. at pp. 589–595), the court observed that these "practices show the generation that adopted the Second Amendment understood the right it was enshrining in the Constitution to be limited.  The right to arms familiar to them allowed for both categorical disarmament of groups that the legislature assessed as threatening to the community, and individual disarmament as a consequence for criminal conduct" (*id*. at p. 598).  It reasoned: "[The] historical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, and they were disarmed as a sanction for criminal conduct, whether or not involving physical violence.

9

California's felon disarmament measures are ' "relevantly similar" ' in serving both of these purposes," and "section 29800 imposes a similar burden on the right to arms as do these historical analogues." (*Id.* at p. 598, italics omitted.) Therefore, the court concluded section 29800 is "constitutional, as [it is] 'consistent with the principles that underpin' this nation's 'regulatory tradition.' " (*Id.* at p. 582, quoting *Rahimi, supra*, 602 U.S. at p. 692.)

In *Bey, supra*, 108 Cal.App.5th at page 162, Division Two of the Second District Court of Appeal agreed with the *Anderson* court's reasoning and followed its holding. The court observed that "California Courts of Appeal have consistently upheld section 29800 against constitutional challenge" and our high court has not taken the issue for review. (*Id.* at p. 161 and fn. 4.) The Sixth District Court of Appeal also found the reasoning of *Anderson* persuasive and adopted it. (*Gomez, supra*, 110 Cal.App.5th at p. 439.) We will assume for purposes of this appeal that felons have Second Amendment rights and adopt *Anderson*'s holding.

Defendant, however, argues the *Anderson* court did not properly analyze historical tradition. In his view, *Anderson* "overextends the analogical reasoning required under *Bruen*." We are not persuaded. As the United States Supreme Court has explained, "a 'historical *twin*' is not required." (*Rahimi, supra*, 602 U.S. at p. 701.) Rather, "the appropriate analysis" involves "ascertain[ing] whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " (*Id.* at p. 692.) In our view, *Anderson* applied the appropriate analysis and reached the correct conclusion.

Accordingly, we conclude defendant's facial constitutional challenge to count 1 fails because section 29800(a)(1) is consistent with the principles that

underpin this nation's regulatory tradition. (*Anderson, supra*, 104 Cal.App.5th at p. 582.)

B.  *Facial Constitutional Challenge to Count 2, Carrying a Concealed Firearm in Public, and Count 3, Carrying a Loaded Firearm in Public*

Next, defendant contends his convictions of carrying a concealed firearm in a vehicle (count 2) and carrying a loaded firearm in public (count 3) must be reversed because California's firearm licensing scheme is facially unconstitutional under *Bruen*. This contention lacks merit for the reasons stated in *In re D.L.* (2023) 93 Cal.App.5th 144 (*D.L.*).

Section 25400, subdivision (a), provides in relevant part that a person who "[c]arries concealed within any vehicle that is under the person's control . . . any pistol, revolver, or other firearm capable of being concealed upon the person" is "guilty of carrying a concealed firearm." Section 25850, subdivision (a), provides that "[a] person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street . . . ."

Although these statutes appear to be " 'broadly prohibitory,' " they are, in fact, "part of a statutory scheme that contains 'numerous express exemptions,' " and they do not apply to "a person who is licensed to carry a concealed weapon under California law." (*Anderson, supra*, 104 Cal.App.5th at p. 600 [section 25400]; *In re T.F.-G.* (2023) 94 Cal.App.5th 893, 908 [section 25850].)

Until recently, California's firearm licensing scheme "required an applicant to show that 'good cause exists' for issuance of a concealed carry license." (*Anderson, supra*, 104 Cal.App.5th at p. 601.) "California appellate courts have held that this 'good cause' licensing requirement violates the Second Amendment because it is substantively similar to the 'proper cause' licensing requirement found unconstitutional in *Bruen*. [Citations.]

11

However, our courts have also repeatedly held that the 'good cause' provision is severable, and that *Bruen* did not invalidate other provisions of California's licensing law." (*Ibid.* [citing cases]; *In re T.F.-G.*, *supra*, 94 Cal.App.5th at p. 909 ["California law continues to authorize the denial of license applications on statutory grounds not implicated by *Bruen*"].)

Defendant argues the " 'good cause' " requirement is not severable from California's former[5] licensing scheme, so any crime premised on the absence of a license for a concealed and loaded firearm violates the Second Amendment. In other words, he challenges "the state's authority to impose criminal penalties on *any* individual who carries a loaded handgun in public in violation of the state's [former] license regime, regardless of whether the noncompliance stemmed from a constitutionally sound requirement." (*In re T.F.-G.*, *supra*, 94 Cal.App.5th at pp. 914, 918 [rejecting facial constitutional challenge to section 25850].)

We have already rejected this argument in *D.L.*, *supra*, 93 Cal.App.5th at pages 163–165. There, we explained the "good cause" provision is severable from California's statutory licensing scheme as the provision is (1) "grammatically separable because it is contained in a discrete subdivision," (2) "functionally separable because the remaining provisions are 'complete' in and of themselves, and 'capable of independent application,' and (3) " 'volitionally severable' " as "[t]he remaining requirements for obtaining a license to carry a concealed firearm . . . are objective criteria and do not rely

_____

[5] At the time defendant was found with a gun in his car, an application for a firearm license required proof that "[g]ood cause exists for issuance of the license." (Former § 26150, subd. (a)(2), as amended by Stats. 2015, ch. 785, § 2.) Since *Bruen* was decided, the Legislature deleted the "good cause" requirement from the statute. (Stats. 2023, ch. 249, § 10; *Bey*, *supra*, 108 Cal.App.5th at p. 163.)

on the 'good cause' requirement in any way." (*Id.* at p. 163; see *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270–271 1 [an invalid provision can be severable from a statute when it is " 'grammatically, functionally, and volitionally separable' "].)

Defendant argues we should not follow *D.L.* because, he asserts, the opinion "ignores that *Bruen* specifically distinguished . . . 'shall issue' jurisdictions from" states that " 'have "may issue" licensing laws . . . .' "[6] But the appellant in *D.L.* similarly argued that, even if the " 'good cause' " requirement could be severed, the former licensing scheme was still unconstitutional because of the " 'may issue' " provision. (*D.L.*, *supra*, 93 Cal.App.5th at p. 166.) We rejected the argument as "not supported by the actual holding in *Bruen*," which "was based on the 'proper cause' language in the New York statute, not on its use of the phrase 'may issue.' " (*D.L.*, *supra*, 93 Cal.App.5th at p. 166, citing *Bruen*, *supra*, 597 U.S. at pp. 31, 71; see *People v. Mosqueda* (2023) 97 Cal.App.5th 399, 412 ["The *Bruen* majority . . . did not hold that . . . 'may issue' laws are *facially* unconstitutional."].) We further observed the argument was "not a facial challenge because the argument would not apply in all circumstances." (*D.L.*, *supra*, 93 Cal.App.5th at p. 166.)

---

[6] Former section 26150 provided that the sheriff "may issue a license" to a person who proves certain requirements. (Former § 26150, subd. (a)(2), as amended by Stats. 2015, ch. 785, § 2.) Section 26150 has been amended and currently specifies that the sheriff "shall issue" a license upon proof of eligibility. (Stats. 2023, ch. 249, § 10.)

Defendant does not persuade us that *D.L.* was wrongly decided.[7] Consequently, his facial constitutional challenge to his convictions for carrying a concealed and loaded firearm in public fails.

C.     *As-applied Challenge to Count 1*

In addition to his facial challenge, defendant claims his conviction for possession of a firearm by a felon is unconstitutional as applied to him.[8] (See *Tobe*, *supra*, 9 Cal.4th at p. 1084 [an as-applied constitutional challenge requires determining whether "a specific application of a facially valid statute

---

[7] Here, we observe that defendant's reliance on *Smith v. Cahoon* (1931) 283 U.S. 553 is misplaced. He claims *D.L.* "ignored" *Smith*'s discussion of retroactive severability, but this is not correct. The appellant in *D.L.*, like defendant, argued that severability could not be "applied retroactively to cure the harm from a pre-*Bruen* conviction based on unlicensed possession," relying on *Smith*. (*D.L.*, *supra*, 93 Cal.App.5th at p. 164.) We explained that *Smith* involved a state statute requiring drivers to obtain a " 'certificate of public convenience and necessity,' " which was beyond the power of the state as applied to private carriers such as appellant Smith. (*D.L.*, at p. 164, citing *Smith*, at p. 563.) We then distinguished *Smith* as follows: "The *Smith* decision then addressed the severability of the statute. If the statute were severed to apply the certificate requirement to common carriers but not private carriers, then the statute as it applied to private carriers would be 'void for uncertainty' as it would prescribe ' "no standard of conduct that it is possible to know." ' [Citation.] In other words, there would be no 'valid scheme applicable to private carriers.' [Citation.] There really was no way to know 'what eventually [would] be eliminated and what [would] be left' after eliminating the unconstitutional aspects of the law [citation], because the requirements of the lawful and unconstitutional aspects of it were intertwined and not functionally or volitionally severable. Here, unlike *Smith*, a valid firearm licensing framework remains even if the 'good cause' requirement is severed. Severability does not create the same uncertainty the *Smith* decision suggested might have existed in that case." (*D.L.*, at p. 164.)

[8] Defendant preserved the issue for appeal by raising an as-applied challenge with the trial court in a motion to dismiss.

14

or ordinance to an individual or class of individuals" has resulted in an impermissible deprivation of a protected right].)

Defendant argues section 29800(a)(1) violates the Second Amendment as applied to him because, he asserts, "None of [his] prior felony convictions involved dangerous conduct." The *Anderson* court, however, demonstrated the "historical evidence shows that individuals were disarmed as a preventative measure . . ., and they were disarmed as a sanction for criminal conduct, *whether or not involving physical violence*." (*Anderson, supra,* 104 Cal.App.5th at p. 598, original italics deleted, italics added; see *Medina v. Whitaker* (D.C. Cir. 2019) 913 F.3d 152, 158–159 (*Medina*) [the historical record shows "the public in the founding era understood that the right to bear arms could exclude at least some nonviolent persons"].)

The *Anderson* court further emphasized that "*categorical* disarmament laws are not inconsistent with the Second Amendment," explaining: "The legal tradition that traces back to the English Bill of Rights anticipates legislatures will regulate the right to arms; in particular, it anticipates legislatures will entirely prevent some members of the community from exercising the right. [Citation.] Supreme Court precedent confirms that regulation may take the form of a categorical ban on certain individuals possessing firearms. ([*Heller, supra,* 554 U.S.] at pp. 626–627; *Rahimi, supra,* 602 U.S. at p. ___.) 'That some categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details.' " (*Anderson, supra,* 104 Cal.App.5th at pp. 598–599, italics added.) Thus, a categorical ban on felons possessing weapons is " 'consistent with the principles that underpin' this nation's "regulatory tradition." (*Id.* at p. 582.) An individualized finding that a person is dangerous is not required. (See *Medina, supra,* 913 F.3d at pp. 158–159

15

[rejecting the argument that "*only* dangerous persons could be disarmed" and recognizing "the scope of the Second Amendment [in the founding era] was understood to exclude more than just individually identifiable dangerous individuals"]; *United States v. Duarte* (9th Cir., May 9, 2025) ___ F.4th ___, ___ [2025 WL 1352411, at *13] ["our historical tradition reveals that legislatures were permitted to categorically disarm those they deemed dangerous without having to perform 'an individualized determination of dangerousness as to each person in a class of prohibited persons' "]; *United States v. Jackson* (8th Cir. 2024) 110 F.4th 1120, 1128 ["Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed. This history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons"].)

We therefore reject defendant's as-applied challenge to count 1.

D.    *Denial of Defendant's Request for a Modified Jury Instruction*

Finally, defendant claims the trial court erred in denying his request to modify the necessity defense instruction and misstated the law to the jury. Reviewing this claim of instructional error de novo (*People v. Mitchell* (2019) 7 Cal.5th 561, 579), we conclude the claim has no merit.

1.    Background

After the close of evidence, defendant requested modified jury instructions, which he asserted were to "ensure that the laws . . . pass constitutional muster" as applied to him. He proposed the following language which tracked CALCRIM No. 3403 on the defense of necessity, except for the concluding paragraph:

16

"Ari Liccardo is not guilty of 29800(a)(1), 25400(a)(1), 25850(a), or 29815(a) if he acted because of legal necessity.

"In order to establish this defense, the People must prove that:

"1. Ari Liccardo acted in an emergency to prevent a significant bodily harm or evil to himself or someone else;

"2. He had no adequate legal alternative;

"3. His acts did not create a greater danger than the one avoided;

"4. When he acted, he actually believed that the act was necessary to prevent the threatened harm or evil;

"5. A reasonable person would also have believed that the act was necessary under the circumstances;

"AND

"6. Ari Liccardo did not substantially contribute to the emergency.

"The prosecution of proving[9] beyond a reasonable doubt that Ari Liccardo did not act out of legal necessity."

At a hearing on jury instructions, defense counsel justified his proposed concluding sentence that the prosecution had the burden to negate the necessity defense beyond a reasonable doubt as follows: "It's just another version a court could, in theory, make a decision what does it mean to be in lawful possession of a firearm? If the Court incorporates necessity into that making it a required element to pass constitutional muster, then it would be an element that People have to prove beyond a reasonable doubt. If it is a defense, then it is proper to put the burden on the defense by a preponderance, as the courts have done, but if the Court felt that the only

---

[9] Defendant mistakenly omitted "has the burden" and intended his proposed instruction to read, "The prosecution *has the burden* of proving . . . ."

way to save the statute was to incorporate necessity as an element, then it must be proved by the prosecution beyond a reasonable doubt."

The prosecution objected to giving a necessity defense instruction in any form, arguing there was no emergency, "there were reasonable alternatives," and if there was an emergency, defendant "surely would have substantially contributed to it."

The trial court found sufficient evidence to instruct on a necessity defense but gave the standard CALCRIM No. 3403 instruction rather than defendant's proposal.

The jury was thus instructed on the same six elements of defendant's proposed instruction, but the concluding paragraph provided, in conformity with CALCRIM No. 3403, "Mr. Liccardo has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, Mr. Liccardo must prove that it is more likely than not that each of the six listed items is true."

    2.    <u>Analysis</u>

The defense of necessity is a judicially created defense "founded upon public policy . . . . The situation presented to the defendant must be of an emergency nature, threatening physical harm, and lacking an alternative, legal course of action. [Citation.] The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged. [Citation.] Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime." (*People v. Heath* (1989) 207 Cal.App.3d 892, 900–901.) "[T]he defense does

18

not negate the intent element, and the *defendant has the burden of proving the defense* by a preponderance of the evidence." (*Id.* at p. 901, italics added.)

Here, the trial court correctly instructed the jury that it was defendant's burden to prove the defense of necessity by a preponderance of the evidence. (See *People v. Condley* (1977) 69 Cal.App.3d 999, 1013 ["the trial court correctly instructed the jury that the defendants had the burden of proving the defense [of necessity] by a preponderance of the evidence"].)

Defendant, however, argues, "the government, not [defendant] carried the burden to prove beyond a reasonable doubt that [his] conduct was not legally necessary under CALCRIM No. 3403" "because . . . protected conduct under the Second Amendment . . . was the heart of [his] necessity defense."[10]

Defendant's argument fails because his premise is incorrect. Defendant's previous appellate claims are that his convictions under sections 29800(a)(1), 25400, and 25850 are unconstitutional because his possession of a firearm under the circumstances of this case is protected by the Second Amendment, but we have rejected these appellate claims for the reasons we have explained. Our holdings mean his conduct of possessing a concealed, loaded firearm in public as a felon on probation with a probation condition prohibiting him from possessing firearms (in violation of sections 29800(a)(1), 25400, 25850, and 29815) is *not* protected under the Second Amendment.

Defendant offers no authority or persuasive reasoning to support his position that the prosecution bore the burden of negating beyond a reasonable doubt his necessity defense, and his claim of instructional error therefore fails.

---

[10] Defendant notes *Bruen* recognized the Second Amendment generally protects the right to bear arms in public for self-defense (*Bruen, supra*, 597 U.S. at p. 33), and he claims he "clearly carried a firearm for self-defense" in this case.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:

_____
Stewart, P. J.

_____
Richman, J.

A169157, *People v. Liccardo*